UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT KRONENBERG, an individual, on behalf of himself and all others similarly situated,<br><br>                                   Plaintiff,<br><br>            vs.<br><br>ALLSTATE INSURANCE COMPANY, and ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,<br><br>                                   Defendants. | No.<br><br><br><u>CLASS ACTION COMPLAINT</u><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff, Robert Kronenberg ("Plaintiff"), by his attorneys, alleges the following upon information and belief, except for those allegations that pertain to Plaintiff, which are based on Plaintiff's personal knowledge, against Allstate Insurance Company ("Allstate Insurance"), and its subsidiary Allstate Fire and Casualty Insurance Company ("Allstate Fire & Casualty") (collectively, "Allstate" or the "Company").

## I.    NATURE OF THE ACTION

1.      The totaling of a vehicle in an auto accident is a traumatic life event, with potentially devastating consequences, if not physically, then financially.  To allay the financial loss, auto insurance is supposed to compensate car owners, including both insureds and third parties, asserting claims for the total loss of vehicles sustained in accidents.  But an automobile insurance company should not underpay claims by deceptively manipulating the data used to calculate the value of the loss vehicle.  Specifically, New York law prohibits insurance companies from valuing a vehicle by comparing it to vehicles of a different type, including vehicles whose valuations were not based on actual quotations from licensed dealers.  *See, e.g.,* N.Y. Codes R. & Regs. Tit. 11 ("11 NYCRR") (Regulation 64), §216.7.  New York law also prohibits insurance companies from reducing claim values with arbitrary, unexplained, and unjustified adjustments to the condition of comparable vehicles that bear no relation to actual cash value.  *See* 11 NYCRR §216.  An insurer must not misstate or conceal material facts that bear upon its estimate of value.  *Id.*

2.      In negotiating and settling total loss claims, Allstate systematically violates these rules.

3.      First, when Allstate selects vehicles to compare with the loss vehicle, it includes so-called "privately-owned" or "private market" vehicles – vehicles without quotations from

licensed dealers meeting specified statutory requirements, but advertised by private owners in an unspecified private market – that are not fairly comparable to the loss vehicle and generally have prices that are lower than comparable vehicles offered for sale by licensed dealers (because, *e.g.*, as set forth below, the private market is riskier, consumers are not protected in the private market by the consumer laws that protect buyers in the dealer market, and the private market has higher costs because the vehicles need more vetting such as mechanic inspections and vehicle history reports).  Indeed, Allstate internally rates "private market" passenger cars as presumptively in poorer condition than cars in "dealer" condition.  However, to consumers, Allstate misrepresents the private-market vehicles as comparable (i) contrary to applicable statutory requirements (which consumers presume are being followed) that values for comparable cars come from quotes from licensed dealers, and (ii) while failing to disclose that Allstate itself internally rates them as lower-valued than dealer market vehicles, deceiving consumers and cheating them on their claims.

4.      Second, Allstate reduces the value of comparable vehicles derived from the dealer market by an arbitrary amount that it misleadingly calls a "condition adjustment" – thereby misleading the consumer into the false belief that the vehicle has been inspected and its condition is known – without itemizing or explaining the basis for the adjustment as indicated by New York law, which requires that deductions to valuation due to previous damage or the prior condition of vehicles "must be measurable, discernible, itemized and specified."  11 NYCRR §216.7(b)(12) (made applicable to total loss vehicles by 11 NYCRR §216.7(c)(7), and to third-party claims by 11 NYCRR §216.10).  Allstate applies a uniform "condition adjustment" to multiple comparable vehicles involved in a valuation without distinguishing one vehicle from the next.  Like the improper use of the "private-market" vehicles, which have the effect of reducing

claimants' valuations, these arbitrary and unjustified condition adjustments artificially and improperly also reduce claim payments by hundreds or thousands of dollars. Moreover, the database Allstate uses to value total loss claims is inadequate to produce the statistically valid fair market values required by regulation (11 NYCRR 216.7(c)(1)(iii)), and is manipulated to underpay claims.

5.     Allstate's systematic under-valuations and underpayments are contrary to, among other things, the overarching requirements of the New York insurance law (i) that "the insurer offer to claimants" an amount that is "fair and reasonable" (11 NYCRR §216.6(a); *see also* N.Y. Ins. Law §2601(a)(4) (prohibiting insurers from "unfair claim settlement practices" including failure "in good faith to effectuate prompt, fair and equitable settlements of claims arising under its policies")); (ii) the principle of New York insurance law, and repeatedly stated on Allstate's own website, that claimants receive the "actual cash value" for their total loss vehicles (11 NYCRR §§216.6(b), 216.7(b)(16)(iv)); (iii) the requirement that valuations be based on true "comparables" that are "statistically valid," and based on vehicles which are "substantially similar" to the loss vehicle (11 NYCRR §216.7(c)(1)(iii); *see also* §216.7(c)(1)(i), (ii)); and (iv) the requirement that any deductions for previous damage or the prior condition of vehicles be "measurable, discernible, itemized and specified." 11 NYCRR §216.7(b)(12). Allstate's actions also violate its insurance contracts, New York statutes and regulations governing the adjustment of total loss claims, and New York's prohibitions on consumer deception (New York General Business Law §349) and settling insurance claims in bad faith.

6.     As alleged more fully below, Plaintiff's vehicle was totaled in a collision, but as part of Allstate's practices and procedures, Allstate deceptively manipulated the data used to

value his total loss vehicle and failed to comply with minimum standards required by New York law in valuing total loss vehicles, in order to underpay on Plaintiff's claim.

7.     Plaintiff brings this class action on behalf of all citizens of New York asserting insurance claims pursuant to an Allstate private passenger vehicle policy who received a first-party or third-party total loss settlement or settlement offer based in whole or in part either (i) on the price of one or more "private-market" vehicles; or (ii) on the price of comparable vehicles reduced by "condition adjustments" (as described further herein).

8.     Plaintiff and the class seek compensatory damages and treble damages pursuant to N.Y. Gen. Bus. Law §349, attorneys' fees, declaratory and injunctive relief, and disgorgement and restitution of the amounts by which Allstate was unjustly enriched by its wrongful conduct.

## II.       JURISDICTION

9.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. Plaintiff is a citizen of New York and Allstate is a citizen of Illinois (where Allstate Insurance Company and Allstate Fire and Casualty have their principal place of business, and Allstate Insurance Company is incorporated), and Delaware (where Allstate Fire and Casualty is incorporated).

10.     This Court has personal jurisdiction over Allstate because Allstate is a corporation licensed and authorized to do business in New York and has transacted business in Queens County, New York.  This Court has personal jurisdiction over Plaintiff because Plaintiff consents to this Court's jurisdiction.

### III.      VENUE

11.      Venue is proper in this District under 28 U.S.C. § 1391 because this is the District in which a substantial part of the events giving rise to the claims asserted occurred, the Plaintiff resides in this District, the accident totaling Plaintiff's car occurred here, defendants have offices in this District, the denial of insurance benefits and other communications were received here, and the cause of action arose here.

### IV.      PARTIES

12.      Plaintiff Robert Kronenberg was at all relevant times a resident of the State of New York.  On or about February 23, 2018, Plaintiff was operating a motor vehicle in New York State that was hit by "WP" (the initials of the individual who hit Plaintiff's car), an insured of Allstate (the "Insured").  Allstate has acknowledged the 100 percent fault of its Insured with respect to the collision.  Plaintiff asserted a third-party claim against Allstate based on the policy it issued to its Insured.

13.      At all relevant times, the Insured was insured under a policy of automobile insurance with Allstate that included coverage for the total loss of a vehicle.

14.      Defendant Allstate Insurance Company is an Illinois corporation with its principal place of business in Illinois.

15.      Allstate Fire and Casualty is a Delaware corporation with its principal place of business in Illinois.  Allstate Fire and Casualty is a subsidiary of Allstate Insurance Company.

## V.      FACTUAL ALLEGATIONS

**A.      Allstate relies on manipulated data to underpay total loss claims.**

16.      Allstate is the second-largest personal lines insurance company in the United States.  Allstate issues automobile insurance policies to consumers in all fifty states, including the State of New York.

17.      Allstate touts itself as a reliable and trustworthy source of insurance coverage.  In its advertising campaigns, Allstate has adopted the motto, "You're in good hands."  On its website, Allstate claims, "In every aspect of our business, we strive to do the right thing—for our customers, our employees, our communities and our world."  In its Annual Report, Allstate claims "Honesty, caring and integrity" as first on its list of its corporate "Values," which list also includes "Accountability".  It lists "Customer focus" as first on its list of corporate "Priorities," and "Put[ting] the customer at the center of all our actions" as first on its list of "Operating Principles."  But when its consumers are involved in life-changing incidents that result in the total loss of auto vehicles, Allstate betrays these principles, playing games and putting profits ahead of people.  Allstate fudges the numbers to shortchange vulnerable consumers, who have lost their critical means of transportation and are relying on Allstate to pay fair value so they can afford to buy a replacement.

18.      Allstate's standard form automobile policy provides coverage for the total loss of a vehicle in an accident.

19.      Indeed, on its website, Allstate states:

**WHAT HAPPENS IF MY CAR IS TOTALED IN AN ACCIDENT?**

\*        \*        \*

√ Your insurer will determine whether the vehicle is a total loss, based on repair costs.

√ Your insurer will issue payment for the actual cash value of the totaled vehicle, minus your deductible on your comprehensive or collision coverage.

*        *        *

To determine your car's worth (the "actual cash value" in insurance terms) at the time of the accident, insurers typically use a number of factors to figure your car's actual cash value, including its age, condition, mileage and resale value, in addition to the selling price of similar vehicles in your area..

https://www.allstate.com/tr/car-insurance/what-if-car-totaled.aspx.[1]

20.    Allstate's website elsewhere states:

**TOTAL LOSS VEHICLES**

If the cost to repair your car is greater than its cash value, it's considered a total loss vehicle[1]. In this case, Allstate will pay up to the actual cash value of your car minus your deductible.

https://www.allstate.com/auto-insurance/auto-claims-info.aspx.  Similarly, in the "Frequently Asked Questions" section of its website regarding auto claims, Allstate states:

**What happens if my vehicle is totaled?**

A claims representative will review the estimate and determine the actual cash value of your car. If the cost to repair your car exceeds the amount its worth, your car will be declared a total loss, or "totaled."[1]. In that case, Allstate will pay you the actual cash value of your car, up to your policy limit, minus your deductible.

https://www.allstate.com/auto-insurance/auto-claims-faq.aspx.

21.    The overarching requirement of New York insurance law is that the insurer offer to claimants an amount that is "fair and reasonable as shown by its investigation of the claim" (11 NYCRR §216.6(a)).  Allstate's stated assertion that it will pay the actual cash value of a total loss vehicle (less any applicable deductible) is consistent with this requirement, and with the principle of New York insurance law that "actual cash value" is the best measure of value, and equates with the replacement value of an item "substantially identical to the item damaged" (11

---

[1] All emphasis herein is added, unless otherwise indicated.

NYCRR §216.6(b); *see also* §216.7(b)(16)(iv) (discussing "actual cash value" in the context of salvage vehicles, and requiring that an insurer "shall use the methods prescribed in subparagraph (c)(1)(i) or (iii) of this section" (for valuing total loss vehicles) "[f]or the purpose of determining the vehicle's actual cash value pursuant to this paragraph.").

22.     As set forth below, however, Allstate systematically fails to offer and pay the actual cash value for total loss vehicles, and arrives at valuations by methods that violate New York law on valuing total loss vehicles, and thus cannot be deemed, and are not, "fair and reasonable."  The amounts Allstate offers are not supported by its actual investigation, and are not otherwise adequately supported or justified.

23.     In the event of a total loss, Allstate promises in its policies that it will pay the claimant the "actual cash value" of the vehicle before the accident.

24.     New York insurance law regarding "Adjustment of total losses" provides that:

(1) If the insurer elects to make a cash settlement, <u>its minimum offer</u>, subject to applicable deductions, <u>must be one of the following</u>:

(i) The average of the retail values for a substantially similar vehicle as listed in two valuation manuals current at the date of loss and approved by this Department. Manuals approved for use are -- The Redbook, published by National Market Reports Inc., and The N.A.D.A. Official Used Car Guide, published by the National Automobile Dealers Used Car Guide Company. ...  The insurer may deduct documented, reasonable dealer preparation charges, up to $100, from the average of the retail values....

(ii) A quotation for a substantially similar vehicle, obtained by the insurer from a qualified dealer located reasonably convenient to the insured. A reasonable location shall be within 25 miles of the place of principal garagement of the motor vehicle. ....

(iii) A quotation obtained from a computerized database, approved by the superintendent, that produces <u>statistically valid</u> fair market values for a <u>substantially similar vehicle</u>, <u>within the local market</u> area <u>that meets all the following minimum criteria</u>:

   (a) it shall produce values for at least 85 percent of all makes and models of private passenger automobiles, as defined in section 67.1(a) of this Title, for the last 15 model years, and shall take into account the values of all major options for such vehicles;

(b) <u>it shall rely upon values derived from licensed dealers</u>, which have minimum sales of 100 motor vehicles per year in the local market area for all vehicles of seven model years or less of age, and be <u>based upon the physical inventory of vehicles sold within the 90 days prior to the loss and vehicles which are available</u>; and

(c) it shall monitor the average retail price of private passenger automobiles when there is insufficient data or inventory available from licensed dealers to ensure statistically valid local market area values. ...   [11 NYCRR §216.7(c)(1)(i)-(iii).]

25.      11 NYCRR §216.10 (“*Standards for prompt, fair and equitable settlement of third-party property damage claims arising under motor vehicle liability insurance contracts*”) expressly makes §216.7(c)(1) and numerous other subsections of §216 applicable to third-party claims (such as those of Plaintiff) as well.

26.      Upon information and belief, as a matter of practice, Allstate does not rely on criteria (i) or (ii) of §216.7(c)(1) to come up with valuations for total loss vehicles, but relies on the criteria in subsection (iii).

27.      As subsection (iii) states, in order for an insurer such as Allstate to rely on data obtained from a computerized database, the data must produce “<u>statistically valid</u> fair market values” for “substantially similar” vehicles “within the local market.”  “Substantially similar vehicle” is defined in §216.7(a)(4) as “a vehicle of the same make, model, year and condition, including all major options of the insured vehicle.  Mileage must not exceed that of the insured vehicle by more than 4,000 miles or 10 percent of the mileage on the vehicle at the date of loss, whichever is greater.”  “Local market” is defined in §216.7(a)(10) as “a 100-mile radius ... of the place of principal garagement of the insured’s motor vehicle”).  Additionally, the quotation for the loss vehicle shall “rely on values derived from licensed dealers” in the local market area, and shall be based on physical inventory of vehicles actually “sold” within 90 days prior to the loss and vehicles actually available – indicating (especially when read in conjunction with §216.7(c)((1)(i)) that it should be the retail selling price of those vehicles.  The “minimum

criteria" of §216.7(c)((1)(i)-(iii)) are required, as the statute says, to ensure that the system produces "statistically valid" fair market values for the vehicle.

28.     In addition, §216.7(b) -- which addresses partial losses but is made applicable to §216.7(c) covering "total losses" by §216.7(c)(7) ("All applicable provisions of subdivision (b) of this section ("adjustment of partial losses") also shall apply to the adjustment of total losses...") -- provides that "a good faith offer of settlement" shall be made within six days of the receipt of a notice of claim (§216.7(b)(1)); that "[t]he person [field adjuster] inspecting the damaged vehicle on behalf of the insurer must be licensed or authorized under article 21 of the Insurance Law, to negotiate the loss;" and that "[a]t the time of initial inspection, the person chosen by the insurer to inspect damages must attempt to enter into negotiations, involving the extent of damages."  §216.7(b)(3).

29.     Allstate bases its offers and payments on manipulated data and reports that do not meet Allstate's duties under New York law, imposing arbitrary and unexplained "condition adjustments" to artificially reduce the values of comparable vehicles and basing its valuations on private-market vehicles that are not comparable to the insured vehicle.  The database it utilizes generates manipulated, inaccurate and scattershot data that is neither statistically reliable nor statistically valid.

30.     To calculate its offer and payment, Allstate obtains a valuation report from a third-party company called CCC Information Services, Inc. ("CCC"), utilizing its software, known as "CCC ONE."  These reports purport to contain values for comparable used vehicles recently sold or for sale in the geographic area of the insured.  The reports contain a purported valuation for the loss vehicle based upon the data in the report.  Upon information and belief, Allstate instructs CCC as to what data to include in the report as the basis for the valuation,

including whether to include condition adjustments to comparable vehicles and whether to base the valuation on private-market vehicles that are not comparable to the insured vehicle, with Allstate retaining the ability to make final decisions as to any comparables or adjustments.

31.     Allstate offers its insureds a claim settlement equivalent to the valuation amount found on the CCC report.  The CCC report acknowledges that "[r]egulations concerning vehicle value include New York Regulation 11 NY ADC [sic] 216.7, Regulation 64."  As a threshold matter, upon information and belief, although CCC may be an approved "vendor" of the superintendent of insurance (n/k/a Commissioner of Financial Services of the New York State Department of Financial Services ("DFS")), the actual "database" that is used by Allstate, the CCC ONE software, may not be specifically approved.  *See* §216.7(c)(1) (an insurer's settlement offer "must be one of the following: ... (iii) A quotation obtained from a computerized database, approved by the superintendent...").  A specific request of the DFS about whether the CCC ONE software was approved was answered by a statement only that CCC was approved as a vendor (although it was well known that CCC had previously and currently used, developed and sold to insurance companies multiple other types and versions of claims valuation software).

32.     The CCC valuation reports reduce the estimated values of comparable vehicles, citing a "condition adjustment," but fail to itemize or explain the basis for these condition adjustments.  These condition adjustments are arbitrary and unjustified.  Indeed, even though each comparable vehicle has unique characteristics, the reports reduce the value of multiple comparable vehicles by the same amount, down to the last dollar, without any itemization or explanation for the amount.  These blind and arbitrary reductions bear no relation to the actual "condition" or fair market value of the comparable vehicles or the loss vehicle.  The application of an arbitrary condition adjustment to reduce the value of comparable vehicles artificially

reduces the valuation of the loss vehicle to benefit the insurer at the expense of the insured, or those claiming under the insurance policy issued by the insurer.

33.     The reports generated by CCC via its CCC ONE database are inadequate and not "statistically valid" as required by statute, which Allstate fails to disclose.  Instead of producing statistically valid fair market valuations, the reports manipulate data and comparables to Allstate's advantage, resulting in underpayment on claims, and materially misleading consumers, including Plaintiff and class members.

**B.     Private-Market Vehicles**

34.     According to a CCC representative, the CCC ONE software randomly includes privately owned vehicles along with dealer vehicles, and the unverified advertised prices of private vehicles are regularly available to be chosen randomly by the CCC ONE software for use as comparables on the same basis as dealer vehicles.  However, private-market vehicle advertisements are notoriously difficult to verify as to condition or even as to legitimacy without a personal inspection, a mechanic's inspection, and a vehicle history report.  Upon information and belief, CCC does nothing to verify the information in the private market ads, and Allstate accepts the private ad price as a comparable even though there is no VIN ("Vehicle Identification Number"), the existence of the vehicle cannot even be checked, and the actual condition is completely unknown.  According to the CCC report issued for Plaintiff's total loss vehicle, a private-market vehicle (sourced from a "private ad") was one of only three comparables used by CCC (and Allstate) providing the basis for Plaintiff's vehicle's valuation under §216.7(c)(1)(iii).  Although CCC makes the assumption, without basis, that the private-market vehicle is in "typical private owner condition," because, unlike for dealer cars, there is no VIN number listed in the CCC report for the private-market vehicle (which is based on a private ad undisclosed to

the consumer), neither the title nor even the existence of the car can be checked.  The vehicle could be a salvage vehicle, flood damaged, or even a "ghost" vehicle used as part of an advertising or other insurance scam, but the software would never know because there is no VIN number to verify title or existence.

35.     Further illustrating the questionable progeny and condition of the private-market vehicles in CCC's database, the advertised private-market vehicle used as a comparable for Plaintiff was suspect, and far outside the statutorily set maximum distance of 100 miles from the loss vehicle.  In particular, the advertised phone number for the vehicle, upon which the CCC report's valuation of that car was based, was not in service when called.  Additionally, although the non-working phone number listed in CCC's report for the ad was a "609" area code (central-southeastern New Jersey) and presumably based on this the report listed the car as being located in Princeton Junction, NJ (approximately 50 miles away from the loss vehicle), in fact, upon information and belief, the actual advertisement was run in the *Opelousas Daily World*, distributed only in Opelousas County, Louisiana, well over 100 miles (in fact, over 1,400 miles) away from the loss vehicle.

36.     Even assuming advertisements based on which CCC reports generated private-car comparables for other class members had real phone numbers, real locations, and/or were otherwise legitimate, CCC's admitted widespread use of such private-market cars -- the condition or even existence of which is not susceptible of verification by the software -- is contrary to §216.7(c)(1)(iii), which requires quotations obtained from a computerized database to rely on "values derived from licensed dealers."  Further, the CCC software's widespread use of private-market cars – including where it is presented as one of only three "comparables" in arriving at a valuation -- is clearly not a "statistically valid" basis for valuation.  Moreover, there

is no indication that additional values from local dealers could not have been obtained in an area as populated with cars as the New York tri-state area; on the contrary, the CCC representative acknowledged that CCC randomly included private-market vehicles in comparables all the time. (Other examples of the CCC ONE database's unreliability are set forth herein.)  Accordingly, Allstate's total reliance on a database which is incapable of verifying such comparables is violative of §216.7(c)(1)(iii).

37.     Allstate and CCC include private-market vehicles in comparables used in the valuation of total loss vehicles because the prices of such vehicles tend to be depressed.  Among other things:

a.     Private-market vehicles frequently lack a clear chain of title, increasing the risk that the vehicle has been stolen, or otherwise cannot convey clear title.

b.     As indicated above, unlike a dealer vehicle, it is difficult to ascertain from a private advertisement whether the vehicle even exists, without a VIN number, which dealer vehicles will have.

c.     The lack of a licensed dealer standing behind the vehicle increases the likelihood that the vehicle is in poor condition and/or has structural or mechanical problems (or other issues such as misrepresented mileage, etc.) that the private seller could either conceal intentionally, or may not have the mechanical acumen to even be aware of, or fix.

d.     Having a dealer stand behind the vehicle offered for sale (via warranty or otherwise) increases a buyer's confidence about recourse and professional backing, while the absence thereof in a private-market vehicle offered for

sale increases the risk component for the transaction, making buyers less willing to pay a price equivalent to dealer prices, and correspondingly depressing the price.

e.   Buyers do not have the same legal recourse against private sellers that they have against licensed dealers.

f.   The risk involved in a private-market purchase increases the expenses involved in buying a private-market car, including the need to pay for a vehicle history report and an inspection by a mechanic.

38.   Even assuming total legitimacy and no associated risk-based discounts, CCC's own internal ratings system (used by Allstate) rates "private owner" vehicles as lower valued than "dealer" vehicles; yet §216.7(c)(1)(iii) requires that insurers use quotes from licensed dealers to value total loss vehicles such as Plaintiff's vehicle.  Indeed, of the three comparables in CCC's report valuing Plaintiff's total loss vehicle, the private-market vehicle was listed at a price of $2,200, substantially lower than the two dealer-based comparables' list prices of $2,995 and $4,595, and its inclusion depressed the average price of the comparables (and thus the valuation of Plaintiff's loss vehicle) downward (for Plaintiff, by over 14%).

39.   For these reasons, a private-market vehicle is not "a substantially similar" vehicle or a true "comparable" for a vehicle of the same make, model, year and condition.  Allstate's use of private-market vehicles to calculate the value of the loss vehicle artificially reduces the valuation of the loss vehicle to benefit the insurer at the expense of the consumer-claimant.

**C.   Allstate underpaid the total loss claims of Plaintiff and the Class.**

40.   As set forth below, Plaintiff owned a vehicle which was involved in a collision and damaged so seriously as to be a deemed a total loss by Allstate, and made claims with

15

Allstate for the total loss of the vehicle.  Allstate never provided Plaintiff with an estimate of the cost of repair of Plaintiff's loss vehicle and, on information and belief, no such estimate was made or completed by Allstate.  Instead, Allstate provided a written "total loss" settlement offer to Plaintiff, based upon a valuation report obtained from third-party CCC.

41.     Plaintiff Robert Kronenberg was the owner of a 1999 Toyota Camry XLE that was totaled in a collision caused by Allstate's insured on or about February 23, 2018.  The individual who hit Plaintiff's car, "WP," was an Insured of Allstate.  On or about February 24, 2018, Allstate sent Plaintiff a "coverage letter" in which it acknowledged that WP "carries an Allstate Fire and Casualty Insurance Company automobile liability policy" which "provides coverage for property damage, including loss of use of the damaged property and any other out-of-pocket expenses reasonably attributable to the accident and our insured's negligence."  On or about March 19, 2018, Allstate sent Plaintiff another letter stating, "This is to confirm that Allstate is accepting 100% liability for the accident."

42.     Subsequently, Allstate offered to pay, and did pay (pursuant to the regulatory requirement that insurers pay undisputed amounts even if there are amounts still in dispute, *see* 11 NYCRR §216.6(e)), $3,140.00 (plus $278.68 sales tax and minus a $268.61 deduction for salvage value, for a net payment to Plaintiff of $3,150.07) attributable to the value of the vehicle, citing its CCC valuation report.

43.     The CCC valuation report on which Allstate's offer was based listed values of three different comparable vehicles – one of which was the aforementioned private-market vehicle – and applied a uniform condition adjustment of $610 to both of the dealer vehicles without itemizing or explaining the basis of the adjustment as indicated by New York law.  The report reduced the amount of the dealer-based comparable vehicles by exactly the same amount,

regardless of any individual differences in the condition of the vehicles.  These blanket

adjustments were arbitrary and unjustified, drove down the values of the dealer "comparables,"

and they resulted in an underpayment of $610.

44.     Upon information and belief, such uniform condition adjustments are a widespread

practice of Allstate and the CCC ONE database it uses, which has resulted in similar litigation in

other jurisdictions previously (with, *e.g.*, uniform condition adjustments to nine comparables for

multiple named plaintiffs).

45.     There are no legitimate justifications for the $610 uniform "condition adjustment,"

nor has Allstate, or CCC, presented any.

46.     The $610 "condition adjustment" is not justified as a dealer preparation ("dealer

prep") charge, as suggested by a CCC representative.  In 11 NYCRR §216.7(c)(1)(i), deductions

for dealer prep are expressly limited to $100, and must be documented ("[t]he insurer may

deduct documented, reasonable dealer preparation charges, up to $100").  Section 216.7(c)(1)(iii)

does not authorize any larger dealer prep deductions, and it would make no sense for dealer prep

costs to be larger in the context of subsection (iii).  Moreover, the lack of authorization of a

dealer prep charge in subsection (iii) suggests, if anything, that no additional dealer prep charge

is authorized; it surely does not mean an insurer can deduct from the dealer retail price unlimited,

and undocumented dealer prep charges, or any dealer overhead costs for that matter.  The $610

deduction was not based on an examination of the "comparable" vehicle by anyone, nor on any

options missing from the comparables that were present in the loss vehicle (and even if they were

attributed to dealer prep, they would similarly represent an undocumented, unsupported, across-

the-board assumption that both comparables were made ready for sale by different dealers at a

cost of $610).

47.     Nor can the $610 uniform deduction legitimately be for a dealer guarantee or warranty charge, as suggested by an Allstate representative (but not the CCC representative). The CCC report states that the $610 deduction is for a "condition adjustment," not for any guarantee or warranty, and there is no indication whatsoever on the report suggesting that it might be for a guarantee or warranty.  Section 216.7(c)(1)(iii) does not authorize a deduction of any dealer guaranty or warranty.  Moreover, the comparable vehicles were in fact not being sold with a guarantee included.

48.     Indeed, that Allstate and CCC representatives provided inconsistent (and illogical) excuses purportedly explaining the rationale for the $610 uniform deduction tends to strongly confirm that it was not in fact a valid "condition adjustment."

**D.     Additional Facts Showing the CCC Database is Not Compliant and Produces Deceptive Valuations**

49.     That the CCC ONE software does not produce "statistically valid" valuations as required by statute is evident for other reasons.  First, there is no indication as to what the software deems to be "substantially similar".  But, assuming the software's intended population for "comparables" for Plaintiff's loss vehicle was "all 1999 Toyota Camry XLE vehicles currently available at or sold by licensed dealers within 100 miles during the 90 days prior to the date of loss," the CCC database could only come up with two dealer-generated comparables, at least one of which was invalid (as shown below).  The statute's stated requirement for an insurer to be able to use a database is that it can come up with a "statistically valid" price, which requires a large enough sample to assure that the valuation represents the actual cash value, and is not simply the result of luck, or subject to easy intentional manipulation.  The use of just two comparables is not statistically or practically significant – much less statistically valid – if the goal is to know the general actual cash value of a frequently owned vehicle.  It does not provide

a sufficient sample to average special sales, location differences, length of time the vehicle has been on the lot, etc.  The prices listed are the advertised prices without regard to whether they are special sale prices, or internet special discount prices, as opposed to offering prices on the lot. Indeed, Comparable 1 was advertised as an "internet-only" special that must be mentioned at the lot (*i.e.*, CCC used this lower, advertised discounted value, ordinarily unavailable, to reduce the "comp" value to the consumer's detriment and Allstate's advantage).  If the dealer removes the discount the next morning, the average price of the sample could swing wildly -- *e.g.*, if a 25% internet discount is removed from Comp 1 by the dealer the day after Plaintiff's report was produced, the unadjusted average of Comp 1 and Comp 2 would vary by $500 overnight.

50.     Further, while the statute requires that for a vehicle to be "substantially similar" to the loss car, its "[m]ileage must not exceed that of the insured vehicle by more than 4,000 miles or 10 percent of the mileage on the vehicle at the date of loss, whichever is greater" (§216.7(a)(4)), the mileage of Comparable 1 listed in the CCC report (143,638 miles) exceeded the mileage of the loss vehicle (110,038 miles) by well over those amounts (*i.e.*, 33,600 miles, or 30.5%), and the private-market Comparable 3, with mileage of 159,000), was even more off (*i.e.*, by 44.5%).

51.     In addition, the CCC report for Plaintiff's loss vehicle was riddled with inaccuracies.  For example, for Comparable 1, although a VIN check indicated the vehicle was, in fact, a Toyota Camry XLE (as was Plaintiff' car, and as the CCC report stated), the vehicle was *advertised by the dealer as a lower model LE*.  (That the dealer incorrectly believed the vehicle was an LE and not an XLE was confirmed by both telephone and email.)  Thus, the advertised price – ostensibly relied on by the CCC software – was set *in error* and represented

the dealer price for the *lesser* model, improperly depressing the comparable's price (and thus the loss vehicle's value).  The software ignored the discrepancy between the VIN number and the ad.

52.     As confirmed by a CCC representative, the CCC software uses the description of the vehicle in the ad to generate the values of the comparables.  The software does not consider the photographs presented by internet ads put up by dealers.  For example, the photos for Comparable 1 indicated that the vehicle had a replaced front and rear bumper with severe scratches and dents to the rear, and had not been cleaned inside.  (A Carfax report that should have been readily available to CCC also reported that Comparable 1 had been in two accidents, and had an additional damage report, by 2009.)  But the CCC software is incapable of determining that the assumption that Comparable 1 is in perfect condition is invalid.  CCC does not review ad photos, does not inspect the "comparable" vehicles, and evidently also does not consider Carfax reports to check prior accidents and damage, yet simply improperly assumes that such significantly flawed vehicles – whose values are therefore depressed (and thus lower the total loss vehicle valuation) – are "comparables" and "substantially similar" to the loss vehicles, when they are not.  Then CCC and Allstate improperly apply to all such vehicles, falsely and deceptively mispresented as "comparable" vehicles, a uniform, unsupported "condition adjustment."

53.     Comparable 2, in turn, was misrepresented by CCC in its report as a Toyota Camry XLE.  A check of the VIN number indicated that Comparable 2 was, in fact, the cheaper model LE.  That means it has fewer features than the standard features in the XLE, and, commensurately, would be valued at a lesser amount.  It is unknown whether the dealer advertised Comparable 2 as an XLE or an LE.  But if, for Comparable 1, a benign interpretation of the software could be that it determines the model from the VIN and not from the ad, then

Comparable 2 makes it clear that is not the case, since for Comparable 2 the CCC software obviously did not determine the model from the VIN which showed that the car was actually an LE.  And even assuming Comparable 2 was erroneously advertised as an XLE instead of an LE, it nevertheless would not meet the requirement that it be a substantially similar vehicle to Plaintiff's loss vehicle.

54.     Allstate also systematically improperly valued the limited items it did purport to itemize, based on the flawed CCC software and its own practices, to the detriment of consumers, and to Allstate's benefit.  The valuation of tires is one example.  11 NYCRR §216.7(b)(11) provides that "Deductions for betterment and/or depreciation" "for parts normally subject to repair and replacement during the useful life of the insured motor vehicle" (such as tires) "shall be limited to the lesser of" "(i) an amount equal to the proportion that the expired life of the part, to be repaired or replaced, bears to the normal useful life of that part; or (ii) the amount by which the resale value of the motor vehicle is increased by the repair or replacement.  Calculations for betterment, depreciation and normal useful life must be included in the insurer's claim file."  To value tires, the CCC ONE internal guidelines, and Allstate, both considered only one factor – tire tread depth – in making adjustments to the value of a tire.  Allstate and the CCC database ignored all other factors, such as the original cost and quality of the tire(s) (*e.g.*, whether it was a $200 tire, or a $40 tire); the U.S. Department of Transportation tread wear, traction and temperature quality ratings stamped into the sidewall of all tires manufactured and sold in the U.S.; whether the wear was uniform on all tires or not (which could suggest deeper problems); scuff marks; and other damage such as sidewall bubbles and cracks in the rubber.

55.     As to measuring tire tread wear, consistent with the way tire tread depth is usually measured, by standard tire tread depth gauges (in the U.S.), the tread wear is generally measured

in 1/32 inch increments, with typical new tires measuring 11/32 inch tread depth, and most regulations requiring tires to be changed when the tread depth is below 2/32 inch.  However, the CCC ONE internal guidelines use percentage ranges, which do not match the actual measurements in 1/32 inch increments, and instead set wide ranges that tend to greatly reduce the tire's values.  CCC ONE's internal ratings set forth ranges of "under 40% of new" (in what Allstate/CCC call the "Fair" category), 41-68% of new (in what Allstate/CCC call the "Private Owner" category), 69-90% of new (in what Allstate/CCC call the "Dealer" category), and "[o]ver 90% of new" (the "Excellent" category).  But because these large ranges are not correlated to the actual tire tread measurements, the categories are effectively wider than they are deceptively made to appear, and the categories skew tire valuations lower than common sense (and New York law) dictates they should be.  For example, a car with an actual tread depth of 5/32 (46% of the "new tire" rating of 11/32), would need to be 8/32 (or 73% of new) to get any better rating by the software; and any tread depth under 5/32 (which is 46% of new) would get the lowest rating, of "40% or less of new" ("Fair" condition), no matter if the tread depth has 40% of its tread life left, or is completely bald.  This has the effect of skewing reality and improperly pushing consumers (whose totaled vehicles are not likely to be in the top rating range of "over 90%", which only applies to new tires and tires that have a mere 1/32 of an inch of wear) lower in value rating, and resulting in exaggeratedly depressed valuations.

56.     To make matters worse, despite the CCC internal ratings range, Allstate uses a rating system that actually skews valuations further away from reality.  Notwithstanding that tire tread depth is uniformly measured in the United States in 1/32 inch increments (and even the CCC rating categories are divided using measurements delineated in 32nds of an inch), Allstate applies a measurement system calibrated in whole ninths, with new passenger car tire treads

rated at 9/9ths of an inch instead of 11/32nds.  For example, Plaintiff's tires were measured at 7/9, which calculates as 77.7% of the tire's original tread remaining.

57.     A range measured only in 1/9ths (along with the excessively wide percentage-based categories used by CCC) needlessly creates artificial categories which skew consumers' valuations and are inconsistent with the regulatory requirements aimed at measuring true depreciation (*see* 11 NYCRR §216.7(1)(b)(11)).  The standard U.S. measurement is much more precise with each whole 32nd representing only a 3% change, while the more than three times wider measurement in whole ninths represents an 11% change between ninths.  Allstate counts on the fact that this may not appear significant to unsuspecting consumers, but measuring in 1/9 increments, for example, would virtually assure precluding claimants' tires from being rated in CCC's top category (listed as being "over 90% of new" as set forth above), except in the unlikely event that their total loss occurred as they were exiting the tire shop after purchasing new tires (since a non-perfect rating of 8/9 translates to 88.8% of new, *i.e.*, a lower category).  A measurement in whole ninths does not correlate to standard measurements of tread depth in 32nds, or to the CCC categories.  The result is tire valuation ratings even more distorted than CCC's wide ranges.  Moreover, it appears from Internet searches that tire tread gauges calibrated in 9ths of inch are not publicly available for purchase; thus, claimants cannot practicably check Allstate's measurements.

58.     Allstate has thus intentionally chosen a measurement and valuation system which is likely to push consumers into lower-tire value categories, to undervalue consumers' tires (and, thus, their loss vehicles).  Yet Allstate's and CCC's system baselessly, and without any verification, assumes the condition of all "comparable" vehicles' tires to be in perfect, brand new condition, not elevating the loss vehicle's value as a credit for having tires in better condition

than the comparables (even though dealers, much less private-market sellers, generally will not put new tires on a car unless they are so badly worn as to discourage any sale).

59.     Plaintiff's tires were name brand, high quality Goodyear tires, with an Allstate measurement of 7/9 or 77.7% of their original tread remaining, and which, at the time of their valuation retailed in a range around $100.  Allstate assigned a value to said tires of only $4.50, with no explanation of how that value was calculated.  Allstate's valuation report provides no evidence that Allstate considered the selling price of the tires in calculating a value that would compensate Plaintiff for his loss.  Upon information and belief Allstate's practice is to value every total loss claimant's tires in the same way.

60.     In addition to the above-described deception, Allstate's entire method of valuation of tires is deceptive and improper in that it does not comply with the valuation methods prescribed for parts normally subject to replacement during the useful life of the vehicle, set forth in 11 NYCRR §216.7(1)(b)(11), made applicable to total losses by 11 NYCRR §216.7(c)(7) and §216.10 (third-party claims).  Using the methods prescribed in the cited regulation would result in a value approximately 20 times higher than $4.50.  Substantially similar used Goodyear tires with the same remaining tread retailed between $76 and $96 per tire at the time of loss.

61.     In sum, the CCC ONE software could only muster three "comparables" for a widely sold car, in one of the most populous areas of the country.

a)      One of them was a private-market vehicle (contrary to the requirements of §216.7(c)(1)(iii)), about which essentially nothing could be verified, even as to title, as there was no associated VIN number, and the phone number for the purported ad was not in service (and the ad turned out to be placed in Louisiana, well outside the statutory "local market" limit).  As described above, it generated a substantially lower list price

24

value than the dealer-vehicle comparables, to the detriment of Plaintiff, and the benefit of Allstate.  Allstate's offers to settle based on such private-market vehicles are improper and undervalue the total loss vehicles of Plaintiff and Class members.  Allstate regularly includes such private-market vehicles as "comparables," to the detriment of consumers.

b)    The remaining comparables also demonstrate that the CCC ONE database is inadequate to render a "statistically valid" valuation for additional reasons.  For example, providing merely two dealer-vehicle comparables is insufficient to render a statistically valid fair market value for the loss vehicle.

c)    The only two dealer comparables that the CCC ONE software used to come up with a value for the vehicle also show that the database is inherently unreliable.

(i)    For Comparable 1, while CCC representatives stated that the software obtained its data from dealer ads, the report described the car as a different model than the dealer; and because the dealer believed and advertised that the Comparable was a lower-tiered model than Plaintiff's car, the value generated by that dealer was improperly lower than it should have been, driving the valuation of Plaintiff's total loss vehicle down.

(ii)    For Comparable 2, the CCC software misrepresented the car as a Toyota Camry XLE, when a check of the VIN number shows it is the cheaper Camry LE. Although it is unknown whether the dealer advertised the car as an XLE or LE, what is clear is that the database is rife with mistakes.

Accordingly, putting aside the invalid, wholly unverifiable (and possibly non-existent) pre-market vehicle (Comparable 3), the two other comparables generated by the database are rendered completely unreliable by material inaccuracies.

(iii)     The CCC software applies a uniform "condition adjustment" to "comparable" vehicles that is not based on any detailed inspection of the vehicles (whether by Allstate, CCC, or the dealer); is not detailed, measurable, discernible, itemized, or broken down as to dollar amount, or justified by the actual condition of the vehicle; and is not based on any service performed (such as dealer prep), or any guarantees/warranties provided.  The purpose and effect of the "condition adjustments" is to lower the value of the total loss vehicle to detriment of the consumer-claimant, and to the benefit of Allstate.

(iv)     The mileage of vehicles used as comparables exceeded the mileage on the loss vehicle by amounts greater than the allowed amount under 11 NYCRR §216.7(a)(4).

(d)     Allstate also improperly valued the few items it did purport to itemize, based on the flawed CCC software and its own practices, to the detriment of consumers, and to Allstate's benefit, such as its valuation of tires, which skewed valuations and tended to push consumers into valuations much lower than their actual fair value.

62.     Allstate has acted with at least reckless disregard of the rights of others by manipulating the numbers to settle total loss claims, as set forth above.  Allstate has devised valuation methods that are unfair, misleading, deliberately inconsistent, non-compliant with 11 NYCRR §216, and calculated to confuse and deceive consumers (and their advocates) in the settlement process.

63.     Allstate's practices have cost consumers millions of dollars in losses as their claims go underpaid.  Meanwhile, Allstate correspondingly reaps millions in wrongful profits from their improper and deceptive conduct.

## VI.     CLASS ACTION ALLEGATIONS

64.     This action is brought and may properly be maintained as a class action, as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23.  Plaintiff brings all claims herein individually and as a class action (for the class defined below), pursuant to Federal Rule of Civil Procedure 23.

65.     The class consists of all citizens of New York asserting insurance claims pursuant to an Allstate private passenger vehicle policy who, from the earliest allowable time within the statute of limitations to the present, received a first-party or third-party total loss settlement or settlement offer based in whole or in part either (i) on the price of one or more "private-market" vehicles; or (ii) on the price of comparable vehicles reduced by a "condition adjustment."

66.     Upon completion of discovery with respect to the scope of the class, Plaintiff reserves the right to amend the class definition.  Excluded from the class are defendants, their parents, subsidiaries and affiliates, directors and officers, and members of their immediate families.

67.     While the exact number of members cannot be determined, the class consists at a minimum hundreds, if not thousands, of persons asserting total loss claims under policies issued by Allstate, which does business in the State of New York and other states.  The members of the class are therefore so numerous that joinder of all members is impracticable. The exact number of class members can readily be determined by documents produced by Allstate.

68.     There are questions of fact and law common to the class, including the following:

    i.     Whether Allstate used the values of private-market vehicles to calculate the values of loss vehicles;

    ii.    Whether Allstate applied arbitrary and unsupported condition adjustments to

comparable vehicles to calculate the value of loss vehicles;

iii.   Whether, through the foregoing practices, Allstate violated its own stated practices with respect to compensation for total loss vehicles, of measuring a total loss vehicle's value by its "actual cash value";

iv.   Whether, through the foregoing practices, Allstate violated New York Insurance Law, §2601 *et seq.* (Unfair claim settlement practices);

v.   Whether, through the foregoing practices, Allstate violated regulations governing unfair claims settlement practices including 11 NYCRR §§216.0 to 216.7 (Regulation 64);

vi.   Whether, through the foregoing practices, Allstate violated the New York General Business Law ("NYGBL"), §349;

vii.   Whether Allstate's use of private-market vehicles and improper condition adjustments to value loss vehicles caused injury to Plaintiff and the class;

viii.   Whether Allstate's actions were willful and knowing;

ix.   Whether Allstate's actions as set forth herein, damaged Plaintiff and members of the class, and if so, the measure of such damages;

x.   Whether Plaintiff and the class are entitled to an award of compensatory or other damages under NYGBL §349;

xi.   Whether Plaintiff and the class are entitled to an award of treble damages under NYGBL §349;

xii.   Whether Plaintiff and the class are entitled to an award of attorney's fees;

xiii.   Whether Plaintiff and the class are entitled to declaratory and injunctive relief.

69.   Plaintiff has the same interests in this matter as all other members of the class, and his claims are typical of those of all members of the class.  Plaintiff's claims are coincident with and not antagonistic to those of other class members he seeks to represent.  Plaintiff and all class members have sustained damages arising out of Allstate's common course of conduct as outlined herein.  The damages of each class member were caused by Allstate's wrongful conduct.

70.     Plaintiff is committed to pursuing this action and has retained competent class counsel experienced in litigation of this type, and class action litigation in particular.  Plaintiff will fairly and adequately represent the interests of the class members.

71.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Allstate has acted on grounds that apply generally to the class, so that the final injunctive relief and/or corresponding declaratory relief that Plaintiff seeks here is appropriate with respect to the class as a whole.

72.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law and fact enumerated above predominate over questions affecting only individual members of the class, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  Plaintiff's counsel, highly experienced in insurance litigation and class action litigation in particular, foresees little difficulty in the management of this case as a class action.

## FIRST CAUSE OF ACTION
### (Violation of the New York General Business Law §349)

73.     Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

74.     New York General Business Law §349(a) provides:  "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

75.     Allstate's actions complained of herein are deceptive acts and practices in the conduct of Allstate's business that have the capacity to and do deceive and injure consumers, as Allstate unreasonably denied payment of claims to Plaintiff and the members of the class and

knowingly misrepresented and concealed the bases for its total loss valuations.  Allstate

manipulated the bases for its total loss valuations so as to deceive consumers and underpay on

claims, and benefit itself.  Allstate willfully, knowingly and/or negligently failed to adopt and

implement reasonable standards for the investigation of claims, and to use practices to value loss

claims that produced fair and reasonable valuations, and comply with statutory requirements to

produce statistically valid results.  Allstate failed to conduct a reasonable investigation regarding

its claims payments.  Allstate further made false representations as to the characteristics and

benefits of its total loss coverage and insurance policies and represented that they were of a

particular standard, quality, or grade, knowing they were not.

76.     It was a deceptive business practice for Allstate to (1) base its valuation and

payment of total loss claims on values of comparable vehicles that have been artificially reduced

by an arbitrary and unjustified "condition adjustment" that is not itemized or explained (thereby

reducing the value of the total loss vehicles), and pursuant to an otherwise inadequate database

not compliant with applicable regulatory requirements setting minimum standards to ensure,

*inter alia*, that valuations are "fair and reasonable" and "statistically valid"; and (2) base its

valuation and payment of the claims upon values of private-market vehicles.

77.     Allstate's aforementioned conduct continues to occur in the course of Allstate's

business.  Allstate's conduct is part of a generalized course of conduct repeated on thousands of

occasions, and thus has an impact on the public interest.

78.     As alleged above, Allstate's aforementioned conduct is in violation of N.Y.

Insurance Law §2601(a), and 11 NYCRR §§216.0 to 216.7, which sets forth *minimum* standards

for insurers in settling claims.

79.     Allstate's above-described conduct, including its violations of N.Y. Insurance Law §2601(a), and 11 NYCRR §§216.0 to 216.7, is inherently deceptive, and is in violation of the NYGBL §349.  Moreover, Allstate's conduct was willful and knowing.

80.     As a result of Allstate's actions, Plaintiff and class members incurred damages as more fully set forth herein.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

81.     As a result of Defendant Allstate's actions alleged above, which allegations are incorporated herein, Allstate has been unjustly enriched at the expense of Plaintiff and the members of the class.

82.     Allstate knew that Plaintiff and the members of the class would assert claims under Allstate's policies in the event their vehicles suffered total losses covered by policies issued by Allstate.  As alleged above, Plaintiff and class members were entitled to compensation for their total loss vehicles in higher amounts than offered or paid by Allstate.  Allstate knowingly benefitted from its improper conduct alleged above by retaining the amounts for themselves that should have been paid to Plaintiff and the class members.

83.     Under the circumstances set forth above, it is contrary to equity and good conscience to permit Allstate to retain the monies that should have been paid to Plaintiff and the class members.

## THIRD CAUSE OF ACTION
### (Declaratory and Injunctive Relief)

84.     Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

85.     Plaintiff brings this cause of action for himself and the class pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 seeking a declaration that, for those asserting a claim under an auto insurance policy issued by Allstate, it is a violation of New York law, and a deceptive business practice, for Allstate to (1) base its valuation and payment of total loss claims on values of comparable vehicles that have been artificially reduced by an arbitrary and unjustified "condition adjustment" that is not itemized or explained (thereby reducing the value of the total loss vehicles), and pursuant to an otherwise inadequate database not compliant with applicable regulatory requirements setting minimum standards to ensure, *inter alia*, that valuations are "fair and reasonable" and "statistically valid"; and (2) base its valuation and payment of the claims upon values of private-market vehicles.

86.     This court has the power to declare the rights of said Allstate policyholders and those who would be insured under such policies and who may suffer similar losses in the future, as well as those who have suffered valuation-related losses.

87.     Plaintiff, for himself and on behalf of the class, seeks a declaration of the rights and liabilities of the parties herein.

88.     With respect to Allstate's continuing unlawful practices, Plaintiff has no plain, speedy, or adequate remedy at law, the interests of the parties favor an injunction, and an injunction is in the public interest.  Plaintiff therefore seeks an order pursuant to NYGBL §349 permanently enjoining Allstate from (1) basing its valuation and payment of total loss claims on values of comparable vehicles that have been artificially reduced by an arbitrary and unjustified "condition adjustment" that is not itemized or explained, and pursuant to an otherwise inadequate database not compliant with applicable regulatory requirements setting minimum standards to

ensure, *inter alia*, that valuations are "fair and reasonable" and "statistically valid"; and (2) basing its valuation and payment of the claims upon values of private-market vehicles.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following judgment:

A.    An Order certifying this action as a class action, including certifying each cause of action under the appropriate subsection of Fed. R. Civ. P. 23;

B.    An Order appointing Plaintiff as class representative and appointing the undersigned counsel to represent the class;

C.    Declaratory and injunctive relief, including an injunction requiring Allstate to cease and desist from (1) basing its valuation and payment of claims on values of comparable vehicles that have been artificially reduced by an arbitrary and unjustified "condition adjustment" that is not itemized or explained, and/or relying on a database not compliant with applicable regulatory requirements setting minimum standards to ensure, *inter alia*, that valuations are "fair and reasonable" and "statistically valid"; and (2) basing its valuation and payment of the claims upon values of private-market vehicles;

D.    Treble damages under common law and by statute, under NYGBL §349;

E.    Compensatory and/or other damages as warranted by Allstate's conduct described above;

F.    Disgorgement by Allstate of all monies by which it has been unjustly enriched at the expense of Plaintiff and the members of the class, and an imposition of a constructive trust on such monies for the benefit of Plaintiff and the class;

G.    An award of attorney's fees and costs, as provided by law and/or as would be

reasonable from any recovery of monies recovered for or benefits bestowed upon the class; and

H.      Such other and further relief as this Court may deem just, equitable, or proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all of the claims asserted in this complaint so triable.

DATED:  December 4, 2018                    WOLF POPPER LLP


                                By:     ____/s/  Patricia I. Avery_____
                                        Patricia I. Avery
                                        Andrew E. Lencyk
                                        845 Third Avenue
                                        New York, New York 10022
                                        (212) 759-4600

                                        *Counsel for Plaintiff and the Class*